United States District Court
Southern District of Texas

**ENTERED**

February 09, 2021

Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| ALMA  RODELA, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 2:20-CV-45 |
| | § | |
| COMMISSIONER OF SOCIAL | § | |
| SECURITY, | § | |
| | § | |
| Defendant. | § | |

## ORDER

Plaintiff Alma Rodela brought this action on February 13, 2020, seeking review of the Commissioner's final decision determining she was not disabled.  (D.E. 1; Case No. 2:20-mc-317).  On November 5, 2020, Plaintiff filed a Motion for Summary Judgment with a Brief in Support of Claim.  (D.E. 19 and D.E. 20).  On January 6, 2021, Defendant filed a Cross Motion for Summary Judgment.  (D.E. 21).  For the reasons below, the undersigned **RECOMMENDS** the ALJ's decision is supported by substantial evidence and the ALJ applied the correct legal standards when making her findings.  Accordingly, the undersigned **RECOMMENDS** Plaintiff's Motion for Summary Judgment be **DENIED**, the Commissioner's Motion for Summary Judgment be **GRANTED**, the Commissioner's determination be **AFFIRMED**, and this case be **DISMISSED with prejudice**.

## I.  JURISDICTION

The Court has jurisdiction over the subject matter and the parties pursuant to 42 U.S.C. § 405(g).

## II.  ISSUES PRESENTED

Plaintiff contends the ALJ failed to properly evaluate the opinions of Dr. Anthony Montez, Plaintiff's treating psychologist, and Dr. Christopher Klaas, a consultative psychological examiner.

## III.  BACKGROUND

Plaintiff filed an application for disability insurance benefits on September 27, 2017 and for supplemental security income benefits on October 16, 2017, alleging disability as of April 1, 2017, due to depression; a learning disability; an anxiety disorder; inflammatory bowel disease; insomnia; obesity; elbow, hand, wrist, arm and back problems; and bipolar disorder.  (D.E. 12-4, Page 3 and D.E. 6, Pages 5-7).[1]  Plaintiff's applications were denied upon initial consideration on January 18, 2018 and again denied upon reconsideration on June 5, 2018.  (D.E. 12-5, Pages 4-10, 13-17 and 19-23).  At Plaintiff's request, a video hearing was held before an administrative law judge ("ALJ") on December 4, 2018 at which Plaintiff and a vocational expert ("VE") testified.  (D.E. 12-3, Pages 65-100).  The ALJ, Barbara Powell, issued an unfavorable decision on April 24, 2019, finding Plaintiff not disabled.  (D.E. 12-3, Pages 13-27).  In her opinion, the

---

[1]Plaintiff protectively filed for disability benefits and supplemental security income on September 25, 2017.  (D.E. 12-3, Page 16).

ALJ discounted the opinions of consultative psychological examiner Dr. Klaas and Plaintiff's treating psychologist Dr. Montez.  (D.E. 12-3, Pages 24-25).

The Appeals Council declined Plaintiff's request for review on December 12, 2019, making the ALJ's April 24, 2019 decision final.  (D.E. 12-3, Pages 2-3).  Plaintiff then filed this action on February 13, 2020, seeking review of the Commissioner's final decision.  (Case No. 2:20-mc-317, D.E. 1).

## IV.    SUMMARY OF THE EVIDENCE

The undersigned has reviewed the entire record as well as the parties' medical summaries in their respective motions and has summarized the record below.

Plaintiff, at the December 4, 2018 hearing, was a 50-year-old woman with a 10th grade education and a cosmetology license.  (D.E. 12-3, Page 74 and D.E. 12-7, Page 22). She has past relevant work as a legal clerk and cosmetologist.  (D.E. 12-3, Pages 69 and 89 and D.E. 12-7, Page 23).  Plaintiff stated she stopped working on June 16, 2016. (D.E. 12-7, Page 22).

Dr. Montez treated Plaintiff on March 3 and March 25, 2015.  (D.E. 12-8, Pages 87-88).  Plaintiff reported she was taking her prescribed medication of her mental ailments and that she had been feeling slightly better.  (D.E. 12-8, Page 87). They discussed child rearing issues involving school attendance and schedules as well grief and loss issues along with a medication regime and coping strategies.  (D.E. 12-8, Pages 87-88).

On April 1 and April 10, 2015, Plaintiff was again treated by Dr. Montez.  (D.E. 12-8, Page 85).  He noted Plaintiff was "quite emotional" at the first session and "more

relaxed" at her second, that they discussed her family hardships, and again addressed coping and problem solving skills.  (D.E. 12-8, Pages 85-86).

Plaintiff was treated on April 13, 2015 for injuries resulting from a March 4, 2015 motor vehicle accident where she was rear ended while she was driving.  (D.E. 12-8, Pages 3-4).  Plaintiff reported that prior to the accident she was walking two to three miles, three days a week.  (D.E. 12-8, Page 5).  Plaintiff reported she was having physical limitations after the accident and frequent pain and discomfort in the back of her head, neck, back and knees with movement.  (D.E. 12-8, Pages 5-7).  Plaintiff is noted as alert, having a well-groomed appearance, having fluent speech and clear words, coherent thought processes and good insight, being oriented to person, place and time with memory intact and appropriate mood and affect without no obvious deficit.  (D.E. 12-8, Page 7).

Dr. Montez treated Plaintiff on April 17, 2015.  (D.E. 12-8, Page 84).  He noted she looked calm as the session began.  (D.E. 12-8, 84).  He further noted she continued to struggle with her children attending school appropriately and "battles the children daily in this regard."  (D.E. 12-8, Page 84).  Plaintiff indicated she was less depressed since her initial session.  (D.E. 12-8, Page 84).

On April 24, 2015, Plaintiff was again treated by Dr. Montez.  (D.E. 12-8, Page 83).  Plaintiff stated she was taking her medication, focusing her attention on her children, and was coping adequately.  (D.E. 12-8, Page 83).  Dr. Montez discussed the importance of her attending all medical and mental health appointments.  (D.E. 12-8, Page 83).

Over a year later, Plaintiff was treated at Westside Family Health Center on June 8, 2016, following up on her treatment for chronic anxiety, insomnia, and depression. (D.E. 12-8, Page 38).   Plaintiff is noted as having a healthy general appearance, good insight and judgment, "normal mood and affect and active and alert," being oriented to time, place and person and having normal memory.  (D.E. 12-8, Pages 40-41).  Plaintiff continued to be prescribed medications for treatment of anxiety, insomnia and depression.  (D.E. 12-8, Page 41).

On July 14, 2016, a sonograph of Plaintiff's complete abdomen was performed and the impression was mild hepatomegaly (enlargement of the liver) and "[o]therwise normal abdominal sonogram."  (D.E. 12-9, Page 71).  The same day, x-rays were taken of Plaintiff's right shoulder and the impression was "normal shoulder."  (D.E. 12-9, Pages 72-73).

Plaintiff was treated for esophageal pain and reflux on September 7, 2016 at Abdominal Specialists of South Texas.  (D.E. 12-9, Page 30).  Plaintiff is noted as being well groomed and developed, in no apparent distress, alert and oriented and with the appropriate affect and demeanor.  (D.E. 12-9, Page 31).  Plaintiff's medications were adjusted and she was scheduled for a follow up in three weeks.  (D.E. 12-9, Pages 32-33).

On September 26, 2016 Plaintiff was treated at the Christus Spohn Shoreline Emergency Room, complaining of nausea, vomiting and abdominal pain.  (D.E. 12-9, Pages 19-29).  Plaintiff was given medication, directed to follow up with her primary care provider and sent home.  (D.E. 12-19, Page 25).

On October 4, 2016, Plaintiff was treated at Padre Island Family Health Center with a chief complaint as nausea and vomiting and to receive endoscopy results.  (D.E. 12-8, Page 33).  Plaintiff is noted as have a healthy general appearance, good judgment and insight, "normal mood and affect and active and alert," being oriented to time, place and person and having normal memory.  (D.E. 12-8, Page 36).  Plaintiff is noted as having "Major depressive disorder, single episode" which continued to be treated with medication.  (D.E. 12-8, Page 37).

On November 15, 2016, Plaintiff was again treated at Padre Island Family Health Center for several ailments, including depression.  (D.E. 12-8, Page 26).  Plaintiff is noted as "healthy-appearing, well-nourished, well-developed," with good judgment and insight, a mental status of "active and alert and depressed," oriented to time, place and person and normal memory.  (D.E. 12-8, Page 29).  Plaintiff continued to be prescribed medication for treatment of depression and anxiety and had previously been prescribed medication for treatment of insomnia.  (D.E. 12-8, Pages 26-27 and 32).

Plaintiff was treated for two small masses on her right forearm on February 3 and February 20, 2017 for a follow up after receiving an MRI and to schedule surgery.  (D.E. 12-9, Pages 38-45 and 60-66).  Plaintiff is noted at both appointments as healthy-appearing, oriented with a normal mood and affect and active and alert.  (D.E. 12-9, Pages 41 and 44).

On March 2, 2017, Dr. Montez treated Plaintiff, noting there had been a "two year hiatus" in treatment.  (D.E. 12-8, Page 82).  Plaintiff reported the same health issues as her previous conditions and Dr. Montez noted her continued struggles with "severe and

persistent mental illness and various psychosocial stressors." (D.E. 12-8, Page 82). Plaintiff's treatment plan was reviewed and updated.

Plaintiff underwent surgery on March 14, 2017 on her right forearm to remove masses along the ulnar border which Plaintiff report were tender and causing her pain. (D.E. 12-9, Pages 2-3, 5-7 and 9-18). During her follow up appointment on March 29, 2017, it was noted that the wounds were healing well with minimal swelling and Plaintiff had a good range of motion. (D.E. 12-9, Pages 35-39).

Approximately two months later, Dr. Montez treated Plaintiff on May 11, 2017, noting Plaintiff indicated she had been unable to schedule an appointment "due to demands of her children and school." (D.E. 12-8, Page 81). He noted she was highly stressed when the session began but was able to calm herself as it progressed. (D.E. 12-8, Page 81). He discussed coping and problem-solving skills with Plaintiff. (D.E. 12-8, Page 81).

On June 8, 2017, Plaintiff was again treated by Dr. Montez. (D.E. 12-8, Page 80). During her therapy session, they discussed her history of problematic relationships. (D.E. 12-8, Page 80). Dr. Montez also noted that Plaintiff expressed she wanted to work "and discussed the various problems in this domain," as well as coping strategies and "practical matters related to work and her limitations." (D.E. 12-8, Page 80).

Over five months later, Dr. Montez completed a Mental Status Report and Treating Physician Mental Functional Assessment Questionnaire and treated Plaintiff on November 27, 2017. (D.E. 12-8, Pages 70-72). He noted Plaintiff had a history of chronic depression, which is severe, persistent and treated with medication. (D.E. 12-8,

Page 70).  He further noted Plaintiff's general appearance was normal as was her voice and speech and she was oriented to time, place and person.  (D.E. 12-8, Page 70).  Dr. Montez reported Plaintiff's mood was depressed, her thoughts were "somewhat disorganized" without hallucinations or delusions and her memory was intact.  (D.E. 12-8, Pages 70-71).  He also reported her attention and concentration was "impaired" and she had "moderate insight and judgment."  (D.E. 12-8, Page 71).  Dr. Montez's impression was Bipolar I Disorder and Major Depressive Disorder.  (D.E. 12-8, Pages 71 and 90).  He opined Plaintiff had a "guarded" prognosis as she "is highly vulnerable to extended family stressors" and "tends to want to help others and assist more than she is capable."  (D.E. 12-8, Page 72).  Dr. Montez noted Plaintiff was "very distressed as her session began" and discussed her mother, who has Alzheimer's and dementia, moving in with her.  (D.E. 12-8, Page 79).  He further opined that Plaintiff "is unable to tolerate a normal workday in terms of relating to others" and would have a poor ability to respond to change and stress in work settings because she "is at risk of anxiety to the point of panic."  (D.E. 12-8, Page 72).  Similarly, Dr. Montez opined Plaintiff "is generally unable to physically or medically tolerate a normal work environment.  She has a history of working for short periods of time at reduced hours as a hairdresser [tending] to get fired or simply stop showing up for work."  (D.E.  12-8, Page 76).  He also opined she was "unable to tolerate normal [a] work day or stress due to severity and chronic nature of mental illness."  (D.E. 12-8, Page 90).  He further noted Plaintiff had "significant difficulty sleeping related to depression, anxiety, and severe parenting stressors."  (D.E. 12-8, Page 76).  Plaintiff's treatment plan was to take the medications prescribed by her

primary physician and to participate in psychotherapy.  (D.E. 12-8, Page 77).  Plaintiff was also encouraged as a long-term goal to "[p]ursue employment consistency with a reasonably hopeful and positive attitude" and to "[i]ncrease job satisfaction and performance due to implementation of assertiveness, stress management, and coping strategies."  (D.E. 12-8, Page 77).  Dr. Montez further opined Plaintiff was able to manage her own benefit payments and could understand the meaning of filing for benefits.  (D.E. 12-8, Page 89).

In a November 27, 2017 Function Report, Plaintiff reported she had constant anxiety attacks, became overwhelmed and was unable to function, having issues with personal hygiene care and feeding herself.  (D.E. 12-7, Pages 67-69).  She further reported she took care of her then 10-year old daughter with the assistance of her son. (D.E. 12-7, Page 68).  Plaintiff also reported she drove a car but could not go into public by herself without panicking.  (D.E. 12-7, Page 70).  She also reported she went grocery shopping twice a month for three hours, was unable to handle her own finances, did not spend any time with others, did not talk to or spend time with her family and had every physical and mental limitation listed on the form except hearing issues.  (D.E. 12-7, Pages 70 and 72).

On January 3, 2018, Dr. Klaas performed a consultative psychological evaluation. (D.E. 12-8, Pages 91-96).  His diagnostic impression was an unspecified depressive disorder "with symptoms of insufficient severity to meet criteria for a major depressive disorder but of adequate intensity to cause clinically significant distress and impairment in her social and occupational functioning and in other important areas of her life."  (D.E.

12-8, Page 93).  Also diagnosing her with somatic symptom disorder with predominant pain, he opined Plaintiff "struggles with distressing chronic spinal and upper extremity pain resulting in a significant [portion] of her daily life with persistent anxiety and worrisome thoughts about health involving nearly all of her time and energy."  (D.E. 12-8, Page 93).  He observed Plaintiff was well-kept in appearance; anxious but agreeable; oriented to time, place and person; had an intact remote and visual recall; variable concentration and verbal reasoning skills; and a "dull normal range" for insight and intellect with an IQ of 86.  (D.E. 12-8, Page 94).  He also observed her global cognitive skills fell within the dull normal range considering her practical skills, her verbal communication skills were adequate for informal conversation and, according to Plaintiff, she had a diminished quality of social relationships.  (D.E. 12-8, Page 94).  Plaintiff reported she lived with her two daughters, ages 10 and 27 and her two grandchildren, ages 4 and 12.  (D.E. 12-8, Page 94).  Dr. Klaas opined Plaintiff was able to manage her own finances independently and noted Plaintiff worked at a steady pace while completing the IQ examination.  (D.E. 12-8, Page 95).  He further opined Plaintiff "presents with significant constraints in her ability to successfully engage in a range of age expected work related behaviors."  (D.E. 12-8, Page 95).  Plaintiff reported she had not dated since her boyfriend committed suicide in 2017, she did not have any close friends other than family, managed her personal hygiene independently and helped to care for her minor children and grandchildren.  (D.E. 12-8, Pages 95-96).  Dr. Klaas noted Plaintiff had a "diminished ability to understand and remember instructions and apply information for one-two step activities, especially with more complex tasks."  (D.E. 12-8, Page 96).  He

further noted she had "variable concentration and she has difficulty attending to details, staying on tasks and working at a sustained pace [and] has diminished resources for being able to get along with supervisors, coworkers and the general public." (D.E. 12-8, Page 96).   Dr. Klaas opined Plaintiff was "notably impaired in being able to effectively regulate, modulate or control her emotions and behaviors so as to be able to maintain well-being in a work setting." (D.E. 12-8, Page 96).

On January 8, 2018, Dr. Hector Ortiz performed a consultative physical evaluation.   (D.E. 12-8, Pages 98-106).   He reported Plaintiff was alert, awake and oriented to time, place and person.  (D.E. 12-8, Page 100).   Dr. Ortiz also noted Plaintiff, while anxious, was cooperative, a good historian and interacted well with him.  (D.E. 12-8, Page 100).   He observed Plaintiff had a restricted range of motion in her lumbar spine, a full range of motion in all upper extremities, and normal strength and range of motion in all lower extremities.  (D.E. 12-8, Pages 100-101).   He also found Plaintiff had normal fine finger movements and the ability to handle small objects such as buttons on clothing. (D.E. 12-8, Page 102).   Scans of Plaintiff's lumbar spine indicated it was normal and her right hand was found to have a mild osteoarthritic change in her thumb joint.  (D.E. 12-8, Pages 105-106).

On January 12, 2018, state agency psychological consultant Dr. Mark Schade opined Plaintiff's mental impairments did cause understanding and memory limitations. (D.E. 12-4, Pages 13-14).   Specifically, he opined Plaintiff's ability to remember locations and work-like procedures and her ability to understand, remember and carry out very short and simple instructions was not significantly limited.  (D.E. 12-4, Page 13).

11 / 31

He further opined Plaintiff was moderately limited in her ability to understand, remember and carry out detailed instructions and in her ability to maintain attention and concentration for extended periods.  (D.E. 12-4, Page 13).  He also opined Plaintiff was not significantly limited in her ability to perform activities within a schedule, to maintain regular attendance, to be punctual within customary tolerance, to sustain an ordinary routine without special supervision, to work in coordination with or in proximity to others, to make simple work-related decisions, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  (D.E. 12-4, Page 14).  He further opined Plaintiff was not significantly limited as to social interaction except that she was moderately limited in her ability to accept instructions and respond appropriately to criticism from supervisors.  (D.E. 12-4, Page 14).  In sum, he found Plaintiff "can maximally understand, remember, and carry out detailed but not complex instructions; make decisions; attend and concentrate for extended periods; interact adequately with co-workers and supervisors; and respond appropriately to changes in routine work settings."  (D.E. 12-4, Page 14).

Plaintiff's applications were denied upon initial consideration on January 18, 2018. (D.E. 12-5, Pages 4-10).

On January 23, 2018, Plaintiff was treated for a gynecology consult regarding menopause and birth control.  (D.E. 12-8, Page 115).  Plaintiff reported she had been feeling more depressed lately and had been having menopause symptoms for several months.  (D.E. 12-8, Page 115).  Plaintiff is noted as alert, well developed, in no acute

distress and oriented to time, place and person.  (D.E. 12-8, Page 116).  Plaintiff was prescribed medication for her depression and a full set of labs were ordered.  (D.E. 12-8, Page 117).

Dr. Montez treated Plaintiff on January 25, 2018 and Plaintiff reported she was struggling with significant symptoms of depression related to loss and grief.  (D.E. 12-8, Page 124).  He noted Plaintiff reported she and her children were struggling with her boyfriend's suicide and he discussed mindfulness and cognitive restructuring as well as appropriate expression of emotion.  (D.E. 12-8, Page 124).

Plaintiff was treated by Dr. Montez on March 6, 2018, reporting she was having distressing dreams associated with the theme of death and her responsibility to her children kept her from harming herself.  (D.E. 12-8, Page 123).  Plaintiff was noted as having a good response and Dr. Montez reinforced an appropriate expression of emotion. (D.E. 12-8, Page 123).

On May 15, 2018, state agency psychological consultant Dr. Richard Kaspar agreed with the first state agency psychologist, Dr. Schade, affirming his findings upon reconsideration of the record.  (D.E. 12-4, Pages 50-52).

On May 24, 2018, Plaintiff was again treated by Dr. Montez.  (D.E. 12-9, Page 100).  Plaintiff reported she felt guilt related to the suicide of her boyfriend.  (D.E. 12-9, Page 100).  Dr. Montez addressed coping and adjustment issues with Plaintiff.  (D.E. 12-9, Page 100).

Plaintiff's applications were denied upon reconsideration on June 5, 2018.  (D.E. 12-5, Pages 13-17 and 19-23).  The same day, Plaintiff was treated by Dr. Montez.  (D.E.

12-9, Page 99).  He noted Plaintiff continued "to struggle with symptoms consistent with depression and anxiety." (D.E. 12-9, Page 99).  Plaintiff reported feeling tired and having difficulty sleeping as well as a loss of appetite.  (D.E. 12-9, Page 99).  Dr. Montez discussed coping and adjustment strategies and techniques with Plaintiff and again "reinforced appropriate expression of emotion."  (D.E. 12-9, Page 99).

The next month, in July 2018, Plaintiff got married.  (D.E. 12-3, Page 81). Plaintiff was treated by Dr. Montez on July 23 and July 30, 2018 and he noted Plaintiff was depressed, rushing into a significant relationship and was "highly distressed with how her recent marriage is unfolding."  (D.E. 12-3, Pages 97-98).  Specifically, he noted Plaintiff reported her new husband looked to her take care of most necessities in the household.  (D.E. 12-3, Page 97).  Dr. Montez discussed the nature of depression with Plaintiff and common emotional reactions, including impulsivity.  (D.E. 12-3, Page 97).

On August 29, 2018, Plaintiff was again treated by Dr. Montez.  (D.E. 12-9, Page 96).  During her session, she stated getting married was a mistake and she was better off alone because "her new husband lacks ambition and looks to her for most necessities of daily living."  (D.E. 12-9, Page 96).  Dr. Montez noted they also discussed parenting issues and establishing structure for the children as well as coping and adjustment issues. (D.E. 12-9, Page 96).

Plaintiff was treated on October 4, 2018, for a follow-up of her lab results and an earache.  (D.E. 12-9, Page 101).  It is noted that Plaintiff also wanted to discuss her medication for depression.  (D.E. 12-9, Page 101).  Plaintiff reported she has had three suicide deaths in her family and was feeling depressed.  (D.E. 12-9, Page 101).  Plaintiff

was noted as not well developed, in acute distress, not oriented to time, place and person, and being positive for symptoms of depression. (D.E. 12-9, Page 102). It is reported that Plaintiff "completely ran out of her meds" for treatment of her depression and "has been feeling moody and having hot flashes." (D.E. 12-9, Page 103). Plaintiff was advised to "start her meds back up and try not to run out." (D.E. 12-9, Page 103). Plaintiff also reported she was undergoing grief counseling due to several deaths in the family. (D.E. 12-9, Page 103). Plaintiff was scheduled for a follow-up in six months. (D.E. 12-9, Page 103).

At the December 4, 2018 hearing before the ALJ, Plaintiff testified she stopped working because she "had a lot of anxiety…[and] attacks at work." (D.E. 12-3, Page 69). Plaintiff stated she "would get physically sick, throw up, shake" and would leave work, resulting in her being terminated. (D.E. 12-3, Page 69). She testified she often feels nauseous, cannot breathe, feels lightheaded and is scared to leave her house. (D.E. 12-3, Page 86). Plaintiff further testified she had continuously been searching for new employment without any success since 2016, up to the day before the hearing when she had an interview at a beauty supply house. (D.E. 12-3, Page 73). She stated she thought she could work at a less active and less stressful place but not full time. (D.E. 12-3, Pages 73 and 84). Plaintiff testified she lived with her 11-year old daughter and her 24-year old son and that she relied on her son's income from driving part-time for a band and food stamps to support the household. (D.E. 12-3, Page 76). Plaintiff also testified she had a current driver's license and drove her own car. (D.E. 12-3, Page 76). She stated her son and daughter did most of the household chores, including cooking,

cleaning and laundry and that she helped when she could.  (D.E. 12-3, Page 77).  Plaintiff

testified she sometimes felt nervous, jittery and unsafe in her own home and could not get

out of bed.  (D.E. 12-3, Page 77).  She also stated her 29-year old daughter did "a lot of

the shopping for [her]."  (D.E. 12-3, Page 77).  Additionally, Plaintiff testified she liked

to work in her yard at least two to three times per week and had roses, she watched

church on television and her cousin and children visited her.  (D.E. 12-3, Pages 78 and

86).  Plaintiff testified that since applying for benefits she had both a boyfriend, who had

committed suicide, and she had later gotten married in July 2018 although she stated it

was a mistake she was trying to correct.  (D.E. 12-3, Pages 74, 80-81 and 83-84).

Plaintiff stated she was receiving monthly mental health treatment and had been

prescribed medication for depression and anxiety by her general doctor, not her

psychologist.  (D.E. 12-3, Pages 79-83).

     Also at the hearing, a vocational expert ("VE") classified Plaintiff's past relevant

work as a cosmetologist.  (D.E. 12-3, Pages 89-90).  The ALJ then posed the following

hypothetical:

> Consider a hypothetical individual who is currently 50 years old; who was
> 48 years old at alleged onset; who has a limited educated; can read, write
> and use numbers, and has additional certifications in the field of
> cosmetology as well.  She has the past work history [as a cosmetologist]
> and these restrictions.  In hypothetical 1, I'm going to start where Disability
> Determination Services started, at medium; able to lift and carry 50 pounds
> occasionally, 25 pounds frequently; stand and walk six hours; sit as much
> as six hours.  She can stoop, crouch, kneel, crawl and balance just fine.  She
> can climb stairs only occasionally.  Her work should not involve using
> ladders or other dangerous, unprotected heights; nor should she work with
> machinery that has exposed, dangerous parts such as shop equipment or
> welding equipment.  Right hand, because of some determined arthritis, the
> right hand fingering and handling is limited to frequent; left hand is okay.

She can reach overhead and in any direction just fine.  I would restrict from work that has concentrated exposure to heat.

In terms of further limitations, she can understand, remember, and execute detailed work, but not complex work.  She can make decisions.  I'm going to limit that to low semi-skilled work, SVP 3, in vocational terms.  Low semi-skilled work.  She can attend and concentrate for extended periods of time.  She needs a morning, lunch, and afternoon break.  She can interact adequately with co-workers and supervisors.  She can respond to changes in the routine work setting.  I would limit the contact with the general public to no more than occasional and superficial.  DDS did not add that limitation, but I am.

(D.E. 12-3, Pages 90-91).

The VE testified that such an individual would not be able to perform Plaintiff's past relevant work as a cosmetologist but she would be able to perform medium exertional level positions including cook helper, floor waxer, and industrial cleaner as well as light exertional level positions as cleaner/housekeeping, mailroom clerk and office helper. (D.E. 12-3, Pages 91-94).  The ALJ then included further limitations, such as issues with time and attendance, not producing enough or quality work, taking more breaks than permitted and having a need to be away from the workstation and the VE testified that an individual with those additional limitations would not be able to sustain competitive employment.  (D.E. 12-3, Pages 95-96).

The ALJ issued an unfavorable decision on April 24, 2019, finding Plaintiff not disabled.  (D.E. 12-3, Pages 13-27).  The Appeals Council declined Plaintiff's request for review on December 12, 2019, making the ALJ's April 24, 2019 decision final.  (D.E. 12-3, Pages 2-3).  Plaintiff then filed this action on February 13, 2020, seeking review of the Commissioner's final decision.  (Case No. 2:20-mc-317, D.E. 1).

## V.    THE ALJ'S DECISION

In her April 24, 2019 decision, the ALJ determined Plaintiff had not been under a disability from April 1, 2017 through the date of the decision.  (D.E. 12-3, Page 27).  The ALJ determined the opinions of state agency psychological consultants, Drs. Kasper and Schade, were most consistent with the record and found them to be somewhat persuasive.  (D.E. 12-3, Page 24).  The ALJ noted that while the record indicated Plaintiff "appeared with flat affect and depressed mood," she was able to care for her mother who suffers from Alzheimer's as well as both her 12-year-old daughter and grandson.  (D.E. 12-3, Page 24).  She further noted Plaintiff was "only able to occasionally interact with the public given her depressed mood and flat affect."  (D.E. 12-3, Page 24).

The ALJ discounted the opinion of treating psychologist Dr. Montez, finding his treating notes were "sketchy" because they did not include the length of each treatment session, only sparingly providing objective observations about Plaintiff and, while he at times commented on Plaintiff's mood and affect, he "does not describe her appearance, judgment, insight, memory or concentration."  (D.E. 12-3, Page 24).  The ALJ also noted the "information that Dr. Montez does provide in the treatment notes is more the claimant's subjective self-reporting rather than clinical observations."  (D.E. 12-3, Page 24).  Additionally, the ALJ considered the "significant gaps" in treatment, noting that in March 2017 Plaintiff restarted treatment with Dr. Montez after a two-year hiatus and that after her appointment in June 2017 she did not return until November 2017, when Dr. Montez completed his report.  (D.E. 12-3, Page 24 and D.E. 12-8, Pages 70-72).  The ALJ noted Plaintiff then attended therapy sessions thereafter about once per month.

(D.E. 12-3, Page 24).  The ALJ determined that while Dr. Montez opined Plaintiff was unable to tolerate a normal workday, "his treatment notes do not recommend more frequent therapy sessions or that she explore more intensive treatment."  (D.E. 12-3, Page 24).  Therefore, the ALJ concluded "his opinions lack supportability and are not consistent with evidence from other sources" and therefore were not persuasive.  (D.E. 12-3, Page 24).

The ALJ also discounted the opinion of consultative examining psychologist Dr. Klaas.  (D.E. 12-3, Pages 24-25).  She noted that while Dr. Klaas opined Plaintiff had a "variable ability to concentrate, stay on task, and work at a sustained pace," he also reported that Plaintiff "completed the examination with a steady pace."  (D.E. 12-3, Page 25).  The ALJ further noted that Dr. Klaas opined Plaintiff "could independently manage her own finances, which is inconsistent with his opinion regarding her ability to apply information."  (D.E. 12-3, Page 25).  The ALJ further opined Dr. Klaas' opinion was "somewhat vague," noting that while he opined Plaintiff had diminished resources for being able to get along with others, he did "not express to what degree she can interact with others using vocationally relevant terms."  (D.E. 12-3, Page 25).  The ALJ also noted Plaintiff drives, prepares some meals and is actively applying for jobs which denotes a greater level of functioning than opined by Dr. Klaas.  (D.E. 12-3, Page 25).  As such, the ALJ determined Dr. Klaas' opinion was not persuasive as it was not supported by his own report nor was it consistent with other sources.  (D.E. 12-3, Page 25).

The ALJ determined Plaintiff had the following severe impairments: osteoarthritis; obesity; anxiety; major depressive disorder and bipolar disorder. (D.E. 12-3, Page 18).  The ALJ concluded Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.  (D.E. 12-3, Page 19).  Considering the entire record, the ALJ then determined Plaintiff had the RFC to perform medium work, including lifting and/or carrying 50 pounds occasionally and 25 pounds frequently; standing and/or walking for a total of six hours and sitting for a total of about six hours. (D.E. 12-3, Page 19).  The ALJ did find Plaintiff was restricted in that she:  can climbs stairs occasionally but never climb ladders; must avoid working around unprotected heights and machinery with exposed dangerous parts; can only frequently handle and finger with her right hand; must avoid concentrated exposure to heat; can understand, remember and execute detailed but not complex work; can perform low-semiskilled work; can make decisions and attend and concentrate for extended periods; requires a break in the morning, at lunch and in the afternoon; can respond appropriately to changes in routine work settings; and can adequately interact with supervisors and co-workers but was limited to no more than occasional, superficial interaction the public.  (D.E. 12-3, Page 19). Accordingly, the ALJ determined Plaintiff could not perform her past relevant work but, considering the VE's testimony and Plaintiff's age, education, work experience and RFC, Plaintiff is capable of making a successful adjustment to

other work that exists in significant numbers in the national economy.  (D.E. 12-3, Pages 26-27).

The ALJ noted Plaintiff "independently performs personal care tasks, drives, and helps care for her 12-year-old daughter and grandson" and "[t]he record does not reflect she required emergency treatment or was hospitalized due to her impairments."  (D.E. 12-23, Page 25).   The ALJ further noted Plaintiff "managed her mental health symptoms with approximately monthly outpatient therapy as well as medication."  (D.E. 12-3, Page 25). She determined Plaintiff's mental impairments "restrict[ed] her to detailed but not complex work, with reduced social interactions and she can response to changes in [a] routine work setting.  Overall, the claimant is limited.  However, the medical evidence and other evidence do not demonstrate a further degree of loss of functioning."  (D.E. 12-3, Page 25).  As a result, the ALJ concluded Plaintiff was not disabled from April 1, 2017 through the date of the decision.  (D.E. 12-3, Page 27).

## VI.   STANDARD OF REVIEW

Judicial review of the Commissioner's decision regarding a claimant's entitlement to benefits is limited to two questions: (1) whether substantial evidence supports the Commissioner's decision; and (2) whether the decision comports with relevant legal standards.  *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000).   Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.* (citation omitted).; *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted).  The burden has been described as more than a scintilla but lower than

a preponderance. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (citation omitted). A finding of "no substantial evidence" occurs "only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988) (citations omitted).

In applying the substantial evidence standard, the Court scrutinizes the record to determine whether such evidence is present. However, the Court does not reweigh the evidence, try the issues de novo or substitute its judgment for that of the Commissioner. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (citations omitted); *Carey*, 230 F.3d at 135 ("Conflicts in the evidence are for the Commissioner to resolve.") (citation omitted). It is incumbent upon the Court to look at the evidence as a whole and take into account the following factors: (1) objective medical evidence or clinical findings; (2) diagnosis of any examining physician; (3) subjective evidence of pain and disability and (4) the claimant's age, education and work history. *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991) (citation omitted).

In evaluating a disability claim, the Commissioner follows a five-step process to determine whether (1) the claimant is presently working; (2) the claimant's ability to work is significantly limited by a physical or mental impairment; (3) the claimant's impairment meets or equals an impairment listed in the appendix to the regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the claimant cannot presently perform relevant work. *Martinez v. Chater*, 64 F.3d 172, 173-174 (5th Cir. 1995) (citations omitted). The claimant bears the burden of proof on the first four steps with the burden shifting to the Commissioner at the fifth step who must show that,

in light of claimant's RFC, claimant can perform other substantial work in the national economy. *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

## VII.   DISCUSSION

Plaintiff asserts the ALJ improperly evaluated the opinions of Dr. Montez and Dr. Klaas.  More specifically, Plaintiff asserts the ALJ should have afforded more weight to these opinions when determining Plaintiff's mental RFC.   However, a review of the ALJ's opinion shows she properly considered all evidence in the record, including both Dr. Montez's and Dr. Klaas' opinions, in detail.  Therefore, the undersigned recommends Plaintiff's Motion is without merit.

An individual claiming disability has the burden of proving disability and must prove the inability to engage in any substantial gainful activity.  *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983) (citation omitted).   "The mere presence of some impairment is not disabling per se.  Plaintiff must show that she was so functionally impaired by her [disability] that she was precluded from engaging in any substantial gainful activity.  *Id*. (citations omitted).  Further, it is the task of the ALJ, not this Court, to weigh the evidence.  *Hames*, 707 F.2d at 166; *Holmes v. Colvin*, 555 F. App'x 420, 421 (5th Cir. 2014) (citing *Bowling*, 36 F.3d at 434).  "It is not the place of this Court to reweigh the evidence, or try the issue de novo, or substitute its judgment…[i]f supported by substantial evidence, the Secretary's findings are conclusive and must be affirmed." *Id*.

An RFC is an assessment, based on all relevant evidence, of a claimant's ability to do work on a sustained basis in an ordinary work setting despite impairments.  20 C.F.R.

§ 404.1545(a); *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001) ("RFC involves both exertional and non-exertional factors.")  RFC refers to the most a claimant is able to do despite physical and mental limitations.  20 C.F.R. § 404.1545(a).  The ALJ must consider all symptoms, including pain, and the extent to which these symptoms can be reasonably accepted as consistent with objective medical evidence and other evidence.  The ALJ is not required to incorporate limitations in the RFC that are not supported in the record.  *Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991) ("The ALJ as factfinder has the sole responsibility for weighing the evidence and may choose whichever physician's diagnosis is most supported by the record.") (citation omitted).  Here, the ALJ thoroughly summarized and analyzed Plaintiff's conditions, including her subjective complaints and the objective medical evidence, finding Plaintiff had multiple severe impairments but no impairment or combination of impairments that met or medically equaled the severity of a listed impairment.  After finding Plaintiff was incapable of performing her past relevant work, the ALJ determined Plaintiff had the RFC to perform a modified range of medium work, taking into account Plaintiff's physical and mental impairments.

While both Dr. Montez and Dr. Klaas opined Plaintiff was more limited in certain areas than found by the ALJ, the ALJ is not bound by their assessments so long as she sufficiently explained the weight she assigned to their opinions.  *Beck v. Barnhart*, 205 F. App'x 207, 213-14 (5th Cir. 2006); *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007).  An ALJ may reject any opinion, in whole or in part, "when the evidence supports a contrary conclusion."  *Martinez*, 64 F.3d at 176.  This is what occurred here.

The ALJ discussed the competing evidence at length in her decision, comparing the observations and findings of Dr. Montez and Dr. Klaas with the rest of the record, including their own treatment and examination notes.  She concluded Dr. Montez's treatment notes, which indicated significant time gaps between therapy sessions, were incomplete because they relied on Plaintiff's self-reporting more than clinical observations, they did not include the length of each treatment session, had few objective observations about Plaintiff and never described her appearance, judgment, insight, memory or concentration.  (D.E. 12-3, Page 24).  By not recommending more than once a month therapy sessions and medication prescribed by her primary physician as treatment, the ALJ concluded Dr. Montez's opinion that Plaintiff was unable to tolerate a normal workday due to her mental illness was not persuasive or consistent with the record.  (D.E. 12-3, Page 24).  The ALJ also discounted Dr. Klaas' opinion because his determination was internally inconsistent with his own examination notes as Plaintiff completed the IQ examination at a steady pace, had a "dull normal" IQ and could manage her own finances, drive, prepare meals and actively apply for jobs.  (D.E. 12-3, Pages 24-25).  The ALJ further noted Plaintiff "independently performs personal care tasks, drives and helps cares for her 12-year-old daughter and grandson."  (D.E. 12-3, Page 25).  Additionally, the ALJ observed Plaintiff "managed her mental health symptoms with approximately monthly outpatient therapy as well as medication" and had never been hospitalized for treatment of her mental ailments.  (D.E. 12-3, Page 25).

An ALJ "is entitled to determine the credibility of medical experts as well as lay witnesses and weigh their opinions accordingly." *Greenspan*, 38 F.3d at 237 (citation

omitted).  As to Dr. Montez' s opinion, generally, the opinion of a treating physician who is familiar with the claimant's history should be given more weight in determining disability.  *Myers*, 238 F.3d at 621.  However, an ALJ may decrease reliance on treating physician testimony, giving it less, little or even no weight for good cause, when this testimony includes statements which are brief or conclusory, not supported by medically acceptable clinical laboratory diagnostic techniques or otherwise unsupported by evidence.  *Id.* (citing *Leggett v. Chater*, 67 F.3d 558, 566 (5th Cir. 1995) (citations omitted); *Martinez*, 64 F.3d at 176 ("A treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight" so long as it is supported by the objective evidence and not inconsistent with other substantial evidence) (citation omitted).   Additionally, the Fifth Circuit has characterized responses to a questionnaire format, such as the one here, as the "typical brief or conclusory testimony" that an ALJ may disregard under the good cause exception when lacking "explanatory notes" or "supporting objective tests and examinations."  *Heck v. Colvin*, 674 F. App'x 411, 415 (5th Cir. 2017) (quoting *Foster v. Astrue*, 410 F. App'x 831, 833 (5th Cir. 2011)); and (D.E. 12-8, Pages 70-72).

"Even though the opinion and diagnosis of a treating physician should be afforded considerable weight in determining disability, 'the ALJ has sole responsibility for determining a claimant's disability status."  *Martinez*, 64 F.3d at 176 (citation omitted). Reviewing the lengthy summary of Plaintiff's medical records in the ALJ's opinion, it is clear the ALJ considered Plaintiff's entire medical history before giving less weight to Dr. Montez's opinion.  Further, while Plaintiff takes issue with some of the reasons given

by the ALJ for discounting Dr. Montez's opinion, analyzing each reason individually, when the ALJ's reasons are viewed as a whole along with the record, substantial evidence supports the ALJ's determination.  The ALJ reviewed Plaintiff's entire medical history, including Dr. Montez's brief treatment notes and suggested treatment and properly gave less weight to his assessments.

As a consulting examiner, Dr. Klaas' opinion is not "accorded the controlling weight given to treating physicians."  *Hernandez v. Astrue*, 278 F. App'x 333, 338 (5th Cir. 2008).  However, the ALJ considered those portions of his assessment supported by his examination findings and consistent with the record as a whole.  *Garcia v. Colvin*, 622 F. App'x 405, 409 (5th Cir. 2015).  Ultimately, the ALJ sufficiently explained why she discounted his opinion.  While Plaintiff asserts the results of his examination were not internally inconsistent as found by the ALJ, the undersigned disagrees and finds Plaintiff is simply asking this Court to reweigh the evidence.

The ALJ thoroughly considered the opinions of both Drs. Montez and Klaas and gave sufficient reasons for giving them less weight.  Additionally, two state agency medical consultants, reviewing the record including both Dr. Montez's and Dr. Klaas' opinions, both opined Plaintiff had the ability to remember locations and work-like procedures and her ability to understand, remember and carry out very short and simple instructions was not significantly limited.  (D.E. 12-4, Pages 13-14 and 51-54).  They further opined Plaintiff was moderately limited in her ability to understand, remember and carry out detailed instructions and in her ability to maintain attention and concentration for extended periods but was not significantly limited in her ability to

perform activities within a schedule, to maintain regular attendance, to be punctual within customary tolerance, to sustain an ordinary routine without special supervision, to work in coordination with or in proximity to others, to make simple work-related decisions, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  (D.E. 12-4, Pages 13-14).  They also found Plaintiff was not significantly limited as to social interaction except that she was moderately limited in her ability to accept instructions and respond appropriately to criticism from supervisors and she could maximally understand, remember, and carry out detailed but not complex instructions; make decisions; attend and concentrate for extended periods; interact adequately with co-workers and supervisors; and respond appropriately to changes in routine work settings.  (D.E. 12-4, Page 14 and 51-52).        Further,        Plaintiff's treatment records consistently note Plaintiff as alert; well groomed; with fluent speech, coherent though processes and good insight; oriented to time, place and person; and with appropriate affect, mood, demeanor and memory.  (D.E. 12-8, Pages 7, 29, 36, 40-41, 70, 100, and116 and D.E. 12-9, Pages 31, 41 and 44).

Again, it is the task of the ALJ to weigh the evidence.  *Hames*, 707 F.2d at 165; *Chambliss v. Massam*, 269 F.3d 520, 523 (5th Cir. 2001).  "It is not the place of this Court to reweigh the evidence, or try the issue de novo, or substitute its judgment…[i]f supported by substantial evidence, the Secretary's findings are conclusive and must be affirmed."  *Id*.  Upon review, the ALJ's determination of Plaintiff's RFC is based on substantial evidence.    The ALJ acted within her discretion in interpreting the evidence

before her, including the opinions of Dr. Montez and Dr. Klaas as well as the competing evidence and discussing it at length in her decision.   The ALJ provided sufficient explanations for the weight given to both opinions.  In short, there is substantial evidence in the record during the relevant time period to support the ALJ's decision that Plaintiff was not prevented from performing a modified range of medium work which, considering the VE's testimony, she opined meant Plaintiff was capable of performing work as a cook helper, floor waxer, and industrial cleaner as well as light exertional level positions as cleaner/housekeeping, mailroom clerk and office helper.  (D.E. 12-3, Pages 91-94).   Even though the record illustrates Plaintiff suffers from several severe impairments, substantial evidence supports the ALJ's conclusion that Plaintiff's impairments did not prevent her from performing medium work with restrictions as identified in the RFC during the period at issue.  *Singletary v. Bowen*, 798 F.2d 818, 820-23 (5th Cir. 1986) (Plaintiff who had been repeatedly hospitalized over a long period of time for psychiatric problems and had a "record replete with discussions of his inappropriate behavior and poor social adjustment" could not obtain and maintain employment and was therefore disabled).

## VIII.  CONCLUSION

For the reasons discussed above, this Court finds the ALJ's decision is supported by substantial evidence and the ALJ applied the correct legal standards when making her findings.  Accordingly, the undersigned **RECOMMENDS** the Commissioner's Motion for Summary Judgment be **GRANTED** (D.E. 21), the Commissioner's determination is

**AFFIRMED**, Plaintiff's Motion for Summary Judgment be **DENIED** (D.E. 19) and this case is **DISMISSED with prejudice**.

Respectfully submitted this 9th day of February 2021.

Jason B. Libby
United States Magistrate Judge

## <u>NOTICE TO PARTIES</u>

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within **FOURTEEN (14) DAYS** after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1), General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of *plain error,* from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.  *Douglass v. United Servs. Auto Ass'n,* 79 F.3d 1415 (5th Cir. 1996) (en banc).